# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 23, 2018        Decided June 11, 2019

No. 16-3066

UNITED STATES OF AMERICA,
APPELLEE

v.

MICHAEL D. BIKUNDI, SR.,
APPELLANT

---

Consolidated with 16-3067

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:14-cr-00030-2)
(No. 1:14-cr-00030-1)

---

*Andrew E. Goldsmith*, appointed by the court, argued the cause for appellant Florence Bikundi. *Steven R. Kiersh*, appointed by the court, argued the cause for appellant Michael D. Bikundi Sr. With them on the joint briefs were *Bradley E. Oppenheimer* and *Albert Pak*, all appointed by the court.

*Katherine M. Kelly*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jessie K. Liu*, U.S. Attorney, and *Elizabeth Trosman*, *Suzanne Grealy Curt*,

and *Christopher B. Brown*, Assistant U.S. Attorneys. *Nicholas P. Coleman* and *Elizabeth H. Danello*, Assistant U.S. Attorneys, entered appearances.

Before: ROGERS, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court PER CURIAM.

Concurring Opinion by JUDGE ROGERS.

TABLE OF CONTENTS

INTRODUCTION
I.     REGULATORY AND FACTUAL BACKGROUND
II.    SPEEDY TRIAL RIGHTS
    A.  Speedy Trial Act
    B.  Sixth Amendment
III.   SEVERANCE
IV.   ADMISSION OF EXHIBIT 439
V.    SUFFICIENCY OF THE EVIDENCE
    A.  Money Laundering and Conspiracy
    B.  Exclusion-Based Health Care Fraud
    C.  Health Care Fraud and Conspiracy
VI.   JURY INSTRUCTIONS
    A.  Unanimity
    B.  Aiding-and-Abetting Health Care Fraud
VII.  SENTENCING
    A.  Restitution
    B.  Forfeiture
    C.  Sentencing Enhancements
       1.  Loss Amount
       2.  Abuse of Trust
       3.  Managerial Role
       4.  Violation of Administrative Order

PER CURIAM: Florence Bikundi and Michael Bikundi appeal their convictions by a jury of health care fraud, conspiracy to commit health care fraud, money laundering, and conspiracy to commit money laundering. Suggesting that the government's case was premised on the misconduct of a handful of employees rather than an entire fraudulent business, appellants challenge the denial of Florence Bikundi's motion to dismiss the indictment for violation of her statutory and constitutional rights to a speedy trial; the denial of Michael Bikundi's motion to sever his trial pursuant to Rule 14(a) of the Federal Rules of Criminal Procedure; and the mid-trial admission of a government report pursuant to Rule 16 of the Federal Rules of Criminal Procedure. They also challenge their enhanced sentences, the forfeiture and restitution orders, and the denial of their motions for judgment of acquittal notwithstanding the verdicts pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure. For the following reasons, we affirm.

**I.**

Florence and Michael Bikundi (hereinafter separately "Florence" and "Michael") operated Global Healthcare, Inc. ("Global") to provide home care services that were funded through the D.C. Medicaid program, which, in turn, is funded in part by the federal government, to provide free or low-cost health services to low-income individuals. *See* 42 U.S.C. § 1396-1; D.C. Code § 4-204.05; 42 C.F.R. §§ 435.900–435.965.

**A.**

The D.C. Department of Health Care Finance ("DHCF") administers the D.C. Medicaid program. D.C. Code § 7-

7701.07. Home care service entities assist D.C. Medicaid beneficiaries in performing daily living activities, such as getting out of bed, bathing, and eating. D.C. Mun. Regs. tit. 22 § 3915. Because these services are typically not provided by registered nurses or other medical professionals, home care service entities are required to conduct background checks prior to hiring their aides. DHCF also periodically audits home care service entities for conformance with physician-approved home care plans, and DHCF will withhold future payments upon finding non-compliance with regulatory requirements.

To be eligible to receive D.C. Medicaid payments, home care service entities must be licensed by the Health Regulation and Licensing Administration in the D.C. Department of Health. D.C. Mun. Regs. tit. 22 § 3900. As part of this process, a home care service entity must submit a provider application and enter into a provider agreement. When reviewing the application, the Health and Regulation Licensing Administration determines whether any individual holding a five percent or greater ownership in the entity has been excluded from participation in any federal health care program by checking an "exclusion list" published by the U.S. Department of Health and Human Services ("HHS"). The Administration also conducts annual licensure surveys to ensure that licensed home care entities operate in accordance with D.C. regulations.

To qualify for personal care services covered by D.C. Medicaid, a beneficiary must obtain a prescription from a licensed physician. The beneficiary presents the prescription to the home care services entity, which assigns a personal care aide to the beneficiary. A registered nurse conducts an assessment of the beneficiary's needs for purposes of preparing an individualized plan of care. A licensed physician must

approve the plan of care within thirty days and typically is to re-certify the plan every six months. A personal care aide administers the services in the plan of care. Generally, a registered nurse must visit the beneficiary at home at least once every 30 days to determine if the beneficiary is receiving adequate services.

Personal care aides providing services to D.C. Medicaid beneficiaries are to keep track of the services provided on timesheets. Each timesheet must be signed by the personal care aide and the beneficiary to certify that the stated services were provided. The home care services entity uses these timesheets in support of claims submitted to DHCF for payment.

**B.**

Florence was indicted for health care fraud and money laundering in February 2014. A superseding indictment filed in December 2014, added eight co-defendants, including Michael Bikundi. The 27-count indictment charged Florence and Michael with health care fraud, conspiracy to commit health care fraud, seven counts of money laundering, money laundering conspiracy, and engaging in monetary transactions in property derived from unlawful activity.[1] It charged Florence with health care fraud based on her exclusion from federal health care programs and making false statements involving federal health care programs.[2] Five other co-

_____

[1] 18 U.S.C. § 1347 (health care fraud); *id.* § 1349 (conspiracy to commit health care fraud); *id.* § 1956(a)(1)(B)(i) (money laundering); *id.* § 1956(h) (money laundering conspiracy); *id.* § 1957 (engaging in monetary transactions in property derived from specified unlawful activity); *id.* § 2 (aiding and abetting).

[2] 18 U.S.C. § 1035 (false statements in health care matters); 42 U.S.C. § 1320a-7b (Medicaid fraud).

defendants entered into plea agreements that required them to cooperate with the government.[3]

Viewing the evidence in the light most favorable to the government, as we must, *see, e.g.*, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), reveals overwhelming evidence of pervasive fraud by comprehensive alteration of employee and patient records in connection with services claimed to have been provided by Global. The government presented documentary and testimonial evidence, including the testimony of eight former employees of Global.

Global had a shaky beginning in view of Florence's formal exclusion from participation in federal health care funding programs as a result of the revocation of her nursing license by the Commonwealth of Virginia in 1999. 42 U.S.C. § 1320a-7. The parties dispute whether Florence received the letter notifying her of the exclusion decision, but Florence certainly received and responded to a letter informing her that exclusion proceedings had been initiated. Her license had been issued in her maiden name, "Florence Igwacho," and that name appears on the "exclusion list" published both online and in the Federal Register by HHS. Yet in June 2009, Florence submitted a D.C. Medicaid provider application on behalf of Global Healthcare, Inc. to DHCF that listed "Florence Bikundi" as Global's chief executive officer and listed "Florence Igwacho Bikundi" as a contact person. Although Florence and Michael were not married until September 2009, Florence began using the name

---

[3] Two of the co-defendants had not yet been arrested and remained fugitives at the time of trial. Two former Global employees who were not named as co-defendants in the indictment separately entered into plea agreements that required cooperation with the government. Two former Global employees testified under government assurances that they would not be prosecuted.

"Bikundi" when they became engaged in 2005. According to defense testimony by her father, it is customary in Cameroon, Florence and Michael's home country, for a woman to begin using a man's last name when he provides a dowry, which Michael did before they became engaged. DHCF approved Global's application on July 30, 2009.

At Global, Florence and Michael hired and fired employees, approved employee paychecks, and reviewed the timesheets that were used in support of D.C. Medicaid claims submitted to DHCF. During multiple licensure surveys, surveyors from the Health Regulation and Licensing Administration found deficiencies in Global's record-keeping and personnel files. At trial, former Global employees testified about rampant falsification of records that they had made at the direction of Florence and Michael. Employees testified that to show Global had complied with licensure surveys, they falsified employee files and patient records. For employee files, they altered dates on employees' certifications, included fake credentials for employees who were undocumented immigrants, and created false background checks on them. For patient records, employees created falsified nurse notes, altered dates on physician prescriptions, and altered physician signatures on plans of care.

Global employees also testified about falsification of timesheets submitted to DHCF and unlawful payments to D.C. Medicaid beneficiaries. The employees testified about multiple situations where Florence and Michael were aware that aides were not actually providing services during time periods claimed on timesheets. Although Florence and Michael did on occasion withhold employee paychecks and told personal care aides to cease billing for services they did not provide, neither Florence nor Michael attempted, according to these employees,

to return the money to the D.C. Medicaid Program. Employees also testified about making payments to D.C. Medicaid beneficiaries to sign false timesheets in order to show Global had provided them with home care services.

From November 2009 to February 2014, D.C. Medicaid paid Global a total of $80.6 million. An investigation by the Federal Bureau of Investigation showed that millions of dollars' worth of the D.C. Medicaid payments were deposited directly into three Global bank accounts, for which Florence Bikundi and Michael Bikundi were the sole signatories. Within two days, and usually on the same day, Florence and Michael transferred these funds to separate Global bank accounts and a bank account for Flo-Diamond, Inc., a company incorporated by Florence that was registered to provide home care services to Maryland Medicaid recipients. From these secondary accounts, Florence and Michael transferred the D.C. Medicaid funds to many of the over one hundred other financial accounts that they controlled. Among these accounts, Florence and Michael transferred funds to three accounts in the name of CFC Home & Trade Investment, LLC ("CFC") and Tri-Continental Trade & Development ("Tri-Continental"); Florence and Michael were signatories on these banks accounts as well. CFC and Tri-Continental both generated no income and had no business relationship with Global. Ultimately, checks were written on these bank accounts to Florence and Michael personally.

The jury found Florence and Michael guilty as charged, except on Counts 23, 24, and 25 for engaging in monetary transactions in property derived from unlawful activity. The district court sentenced Florence to 120 months' imprisonment and 36 months' supervised release, and Michael to 84 months' imprisonment and 36 months' supervised release. The district

court required them to pay restitution in the amounts of $80,620,929.20, jointly and severally. The district court also required each of them to forfeit $39,989,956.02 (for the money laundering offenses) and $39,701,764.42 (for the health care fraud offenses), assessed concurrently. The district court denied their motions for acquittal notwithstanding verdicts, and they appeal.

We begin by examining Florence's speedy trial claims, then address Michael's severance claim, and thereafter turn to their evidentiary objections and jury instructions challenges. Finally, we address their challenges to their sentences.

## II.

Speedy Trial. Florence raises both statutory and constitutional speedy trial claims. The statutory claim focuses on the length of the delay and district court's findings about that delay, the constitutional claim on the length of the delay.

## A.

Speedy Trial Act. The Speedy Trial Act provides that "the trial of a defendant . . . shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). Certain periods of delay are to be excluded from the seventy-day maximum, including any period of delay resulting from an "ends-of-justice" continuance. *Id.* § 3161(h)(7).

For an "ends-of-justice" continuance, the district court must "set forth, in the record of the case, either orally or in

writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." *Id.* § 3161(h)(7)(A). Although the "substantive balancing underlying the decision" to grant an ends-of-justice continuance is "entrusted to the district court's sound discretion," *United States v. Rice*, 746 F.3d 1074, 1078 (D.C. Cir. 2014), the findings requirement imposes "procedural strictness," *Zedner v. United States*, 547 U.S. 489, 509 (2006). At the minimum, the district court's findings "must indicate that it 'seriously weighed the benefits of granting the continuance against the strong public and private interests served by speedy trials.'" *Rice*, 746 F.3d at 1078 (quoting *United States v. Bryant*, 523 F.3d 349, 361 (D.C. Cir. 2008)). Although the findings requirement does not call for "magic words" in weighing the competing interests, *id.* at 1079, mere reference to "some rough justice basis" is insufficient, *United States v. Sanders*, 485 F.3d 654, 659 (D.C. Cir. 2007). Similarly, mere "passing reference to the case's complexity" is insufficient, and a district court's failure to make the requisite finding means the delay is to be counted against the defendant's speedy-trial period. *Zedner*, 547 U.S. at 507.

The court's review of Speedy Trial Act claims is *de novo* on questions of law and for clear error for factual findings. *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 202 (D.C. Cir. 2013).

Florence's Speedy Trial Act clock began running on February 21, 2014, when she was arraigned on the initial indictment. The district court granted five ends-of-justice continuances in the period between her arraignment and the filing of the superseding indictment eighteen months later. Florence challenges the sufficiency of the district court's

findings for the last three continuances, on June 16, July 22, and September 5. She maintains that the district court merely relied on the fact that the case was "complex" without properly acknowledging or weighing the countervailing interests of the defendant and the public. Our review is limited to those time periods. *See Rice*, 746 F.3d at 1077–78.

Florence did not object to any of the continuances until July 1, 2015, when she moved to dismiss the superseding indictment. The district court denied the motion while acknowledging that for ends-of-justice continuances, it had to find on the record that "the interest[s] in that continuance outweigh the best interests of the public and the defendant in a speedy trial." Tr. 106 (July 31, 2015 AM). The district court found that the best interests of justice would be served by excluding the time periods "[g]iven the complexity of this case and the reasons stated in open court." *Id.* at 109.

To appreciate the thoroughness with which the district court addressed the ends-of-justice continuances, it is worth noting that in granting the first such continuance, on March 7, 2014, the district court concluded the interests of justice outweighed "the interests of the parties and the public in a speedier trial" because the purpose of the continuance was to "permit defense counsel and the government time to both produce discovery and review discovery." Tr. 5 (Mar. 7, 2014 AM). The court thereby accounted for the nature of the alleged charges, including the complexity of discovery for a conspiracy lasting over five years in which Florence and Michael were alleged to have altered and created false documents in support of their claims for Medicaid reimbursement and in moving reimbursed funds in and out of multiple accounts. On April 24, and again on June 16, the district court concluded that the need for more time remained, referencing "the complexity of the

case and the amount of discovery." Tr. 52 (June 16, 2014 AM). The district court granted a fourth continuance, with Florence's consent, on July 22, as counsel advised that they planned to engage in further meetings and discussions and assured the district court that they had been diligent in reviewing discovery and discussing the case. In granting the final ends-of-justice continuance, the district court noted that Florence was still "sitting in jail" and pressed the government to move quickly in procuring a superseding indictment, while also recognizing that the government still had to produce more documents to the defense. Succinctly, the district court stated, its "finding that this is a complex case continues to hold," Tr. 15 (Sept. 5, 2014 AM), and ruled that the Speedy Trial Act was tolled due to the "complex" nature of the case, *id.* at 22.

The district court's findings on the record in support of the ends-of-justice continuances are similar to those in *Rice* and *Lopesierra-Gutierrez* that were held to satisfy the statutory findings requirement. In *Rice*, the district court justified granting the delay based on the "large number of defendants, the many hours of wiretaps to be transcribed and translated, and the absence of certain defendants still awaiting extradition." 746 F.3d at 1079. The district court took the defendants' interests into consideration by noting that the defense would not be in a position to adequately provide representation until the wiretaps were complete. In *Lopesierra-Gutierrez*, the district court justified the grant of the ends-of-justice continuance on the basis of "the complexity of the case, the nature of the prosecution, and that it would be unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established under the Act." 708 F.3d at 205. In both cases, the district court's conclusion that a continuance would give the defendant more time to review discovery and to prepare for trial demonstrated that the district

court seriously weighed the defendant's interest. *See Rice*, 746 F.3d at 1079; *Lopesierra-Gutierrez*, 708 F.3d at 205.

Similarly, in granting the first continuance, the district court found that due to the large volume of discovery underlying the charges in the initial indictment, a continuance would "permit defense counsel and the government time to both produce discovery and review discovery and evaluate the evidence against [Florence]." Tr. 5 (Mar. 7, 2014 AM). This finding shows the district court weighed Florence's interest by considering that a continuance would give her more time to prepare her defense. The allegations in the initial indictment spanned a period of six years, involving numerous submissions of Medicaid claims. Florence concedes that the district court's findings to support this continuance satisfy the statutory requirements. Appellants' Br. 37 n.18.

Although "best practice" warrants contemporaneous, specific explanation by the district court, *see Zedner*, 547 U.S. at 507 n.7, and the district court often did so, in the circumstances here, the court does not understand the statute to require the district court to repeat all of the details of its findings on the record each time it grants an ends-of-justice continuance, particularly where the charged offenses indicate why discovery would be prolonged. Not only were the circumstances regarding discovery essentially unchanged when the district court granted ends-of-justice continuances, the district court expressly stated on June 16, 2014, that the parties were making arrangements for "the most expeditious way to get discovery into the hands of the defense counsel." Tr. 52 (June 16, 2014 AM). In granting the last challenged ends-of-justice continuance, the district court stated that its prior reason for granting an ends-of-justice continuance continued to apply because discovery was ongoing. Whatever ambiguity

may reside in the Speedy Trial Act about when the district court must place its findings on the record, *see Zedner*, 547 U.S. at 506–07, we hold that the district court's consideration of the lengthy time needed for discovery and its impact on defense counsel's ability to prepare for trial demonstrates that the district court adequately weighed Florence's interests when considering the complexity of the case.

The district court also adequately addressed the public interest. Florence concedes that the district court's statements in support of granting the first two continuances, which referenced the interests of "the public," satisfied the statutory requirements. Tr. 5 (Mar. 7, 2014 AM); Tr. 9 (Apr. 24, 2014 AM); Appellants' Br. 37 n.18. But she maintains that the district court's findings in support of the last three continuances were insufficient. Yet the district court's concern that adequate time was needed for the defense to review the documents produced in discovery and to prepare the defense was directly related to the public interest that trial not proceed prematurely. Florence consented to the next-to-last continuance, and in granting the final continuance, the district court referenced the fact that the underlying circumstances regarding discovery had not changed. When asked by this court during oral argument what rule was being sought, Florence's counsel responded that specific findings to support an ends-of-justice continuance would require the district court to state on the record something to the effect that "I've considered the interests of the public in a speedy trial in this case, and given the facts and circumstances of this case, the interests of the public outweigh the interests in a speedy trial." Oral Arg. 3:34–3:50. The words are slightly different, but the district court's on-the-record findings are to the same effect: considering the public interest in a speedy trial in light of affording defense counsel the opportunity to prepare a defense to a complex fraud involving $80 million in health

care payments. Florence neither suggests her trial counsel should have proceeded to trial before discovery was completed nor challenges the district court's statement that the parties were arranging for the "most expeditious way to get discovery into the hands of defense counsel." Tr. 52 (June 16, 2014 AM). The combination of the district court's references to the public interest and the efficient use of resources suffice to show that the district court seriously weighed the public's interests.

Therefore, Florence fails to show that the pretrial proceedings were delayed so as to violate her statutory speedy trial rights.

**B.**

Sixth Amendment. The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. In *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the Supreme Court articulated a four-factor balancing test for determining whether a defendant has been deprived of this speedy trial right: the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." No single factor is necessary or sufficient to find a deprivation of the right to a speedy trial because the factors are related and must be considered together. *Id.* at 533. To trigger the speedy trial analysis, the length of delay between accusation and trial must "cross[] the threshold dividing ordinary from 'presumptively prejudicial' delay." *Doggett v. United States*, 505 U.S. 647, 651–52 (1992). Generally, a delay of one year is presumptively prejudicial. *Id.* at 652 n.1.

The court reviews the district court's application of the *Barker* factors *de novo*. *See United States v. Tchibassa*, 452 F.3d 918, 924 (D.C. Cir. 2006).

Although the delay of approximately eighteen months in Florence's case triggered the inquiry, the *Barker* factors on balance favor the government. As to the first and second factors, "the delay that can be tolerated for an ordinary street crime is considerably less than a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531. In *Lopesierra-Gutierrez*, this court held that a three-and-a-half year delay was justifiable for a complex conspiracy charge with complicated evidence and multiple defendants. 708 F.3d at 203. Given the complex conspiracy charges at issue here, with voluminous discovery and multiple defendants, a delay of eighteen months was justifiable. Florence also filed multiple pretrial motions as well as an interlocutory appeal and she consented to continuances granted on July 22, 2014, and October 7, 2014. Although not all of her motions delayed the trial, they still contributed to the length of proceedings. Florence does not maintain that the government acted in bad faith in seeking ends-of-justice continuances. *See id.*

As to the third factor, the fact that Florence did not assert her speedy trial rights until she filed a motion to dismiss sixteen months after her arraignment also weighs in the government's favor. The circumstances here are like those in *United States v. Taplet*, 776 F.3d 875, 881 (D.C. Cir. 2015), where the defendant "either joined in or requested many of the continuances, and he waited fourteen months after his arraignment before filing a motion to dismiss under the Speedy Trial Act." The court held no Sixth Amendment violation occurred. Similarly, Florence consented to exclusion of time

under the Speedy Trial Act and did not assert her speedy trial rights early or often.

Finally, the fourth factor favors the government. The "presumptive prejudice" arising from delay of trial for over one year "cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria." *Doggett*, 505 U.S. at 655–56; *see also Taplet*, 776 F.3d at 881. Florence offers no explanation of how the delay impaired her defense, and thus fails to show that her Sixth Amendment right to a speedy trial was violated.

## III.

Severance. There is a preference in the federal system for joint trials. *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Rule 8(b) of the Federal Rules of Criminal Procedure permits joinder of defendants in the same indictment when the defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Rule 14(a), however, permits a district court to sever the defendants' trials if the joinder of "offenses or defendants in an indictment . . . or a consolidation for trial appears to prejudice a defendant or the government." District courts retain significant flexibility to determine how to remedy a potential risk of prejudice, including ordering lesser forms of relief such as limiting jury instructions. *United States v. Moore*, 651 F.3d 30, 95 (D.C. Cir. 2011) (per curiam). Still, the Supreme Court has cautioned that "a district court should grant a severance motion under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury

from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

Michael contends that the district court erred in denying his Rule 14(a) motion because of the unfair prejudice due to spillover effect as a result of the disparity of evidence against him as compared to that against Florence and the fact that they were married. In particular, he points to the evidence that Florence's nursing license was revoked and the repeated references at trial to Florence and Michael as a single unit, "they." The court reviews the district court's denial of a Rule 14(a) motion for abuse of discretion, *id.* at 542, and we find none.

In conspiracy trials, severance is generally not mandated despite a disparity in evidence when there is "substantial and independent evidence of each [defendant's] significant involvement in the conspiracy." *Moore*, 651 F.3d at 96 (quoting *United States v. Tarantino*, 846 F.2d 1384, 1399 (D.C. Cir. 1988)). That is the situation here given the extensive overlapping evidence against Florence and Michael on all charges besides those based on Florence's exclusion. So, although Florence alone was charged with making false and fraudulent representations on the Medicaid Provider Agreement, and no evidence connected Michael to that charge, the government presented abundant independent evidence of Michael's culpable conduct in operating the Global conspiracies to commit health care fraud and money laundering. Employees testified that he instructed them to alter patient records and even to create records for employees that included false information.

Michael fails to demonstrate the health care fraud charges based on Florence's nursing license revocation involved

significantly more serious charges with prejudicial spillover effect than other evidence of his own culpability. The evidence regarding Florence's license and the Medicaid Provider Agreement was part of the same overall fraudulent scheme, in which the government's evidence showed Florence's and Michael's direct involvement. As the evidence regarding Florence was presented at trial, the jury could readily appreciate that the evidence about the license and Medicaid Provider Agreement involved only Florence.

Additionally, it is not exactly uncommon for a husband and wife to be tried together when they are charged with committing the same or similar crimes. *See, e.g.*, *United States v. Johnson*, 569 F.2d 269, 271 (5th Cir. 1978); *United States v. Cianciulli*, 476 F. Supp. 845, 848 (E.D. Pa. 1979); *see also United States v. Carbajal-Nieto*, 390 F. App'x 295, 296 (4th Cir. 2010). Here, the district court instructed the jury to consider each defendant's guilt separately:

> [E]ach defendant is entitled to have the issue of his or her guilt as to each of the crimes for which he or she is on trial determined from his or her own conduct and from the evidence that applies to him or her as if he or she were being tried alone. You should, therefore, consider separately each offense, and the evidence which applies to it, and you should return separate verdicts as to each count of the Indictment, as well as to each defendant.

Tr. 27 (Nov. 9, 2015 AM). Further, the jury was instructed that:

> The fact that you may find one defendant guilty or not guilty on any one count of the Indictment should not influence your verdict with respect to any other count

of the Indictment for that defendant. Nor should it influence your verdict with respect to any other defendant as to that count or any other count in the Indictment. Thus, you may find any one or more of the defendants guilty or not guilty on any one or more counts of the Indictment, and you may return different verdicts as to different defendants [and] as to different counts.

*Id.* at 27–28. The jury is presumed to follow the instructions absent evidence to doubt that they did, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)), and Michael points to no such evidence here. The verdict form was structured to facilitate a decision on each defendant's guilt separately, listing all of the charges against Florence and Michael separately within each count.

In view of the abundant evidence of Michael's involvement in the Global conspiracies, the references at trial to Florence and Michael as "they," even when considered in combination with the license and Medicaid Provider Agreement evidence against Florence, do not demonstrate that the district court abused its discretion in denying his Rule 14(a) motion for a separate trial.

## IV.

Admission of Exhibit 439. Rule 16 of the Federal Rules of Criminal Procedure broadly mandates disclosure of material documents within the government's control upon a defendant's request. Rule 16(a)(1)(E) provides:

Upon a defendant's request, the government must permit the defendant to inspect or copy or photograph

books, papers, documents, data, photographs, tangible objects, buildings or places . . . if the item is within the government's possession, custody, or control and (i) the item is material to preparing the defense; (ii) the government intended to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant.

Additionally, Rule 16(c) provides:

A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if (1) the evidence or material is subject to discovery or inspection under this rule; and (2) the other party previously requested, or the court ordered, its production.

Defense counsel sought discovery well before trial began in September and yet it was not until three weeks into the trial, almost at the end of the government's case-in-chief, that the government disclosed Exhibit 439. A month before trial, the prosecutor asked Don Shearer, the Director of Health Care Operations at DHCF, if it was possible to quantify the amount of actual fraud at Global, and Shearer prepared the report, which purported to show that 567 D.C. Medicaid beneficiaries for whom Global received Medicaid reimbursements did not receive personal care services after Global closed. *See* Concurring Op. at 1–2 (Rogers, J.). Defense counsel objected to admission of Exhibit 439 on the grounds that doing so would be "unfair" sandbagging and that identification and production of the report was "untimely." Tr. 16 (Nov. 3, 2015 PM). On appeal, appellants contend that the government was obligated under Rule 16 to disclose Exhibit 439 and the underlying data,

and that its admission with less than one day's notice violated their substantial rights. The government responds that it did not have an obligation to disclose Exhibit 439 until it received the report.

The court need not decide whether the government's terribly late production of Exhibit 439 constituted impermissible sandbagging under Rule 16. *See United States v. Marshall*, 132 F.3d 63, 69 (D.C. Cir. 1998). Even if the government violated Rule 16, there is no basis to conclude that the district court abused its discretion by not excluding the report. On cross-examination, defense counsel raised doubts about the probative value of Exhibit 439 for quantifying the health care fraud. Shearer, who prepared the report, admitted that he did not know how many of Global's previous beneficiaries were no longer receiving Medicaid services because they were deceased or disqualified as a result of increased income.

Cross-examination thus took some of the sting out of the report, much as the district court anticipated in referring to the report as "ripe fodder" for cross-examination. Tr. 112 (Nov. 3, 2015 PM). Defense counsel objected that the district court's suggestion of an overnight postponement so defense counsel could interview Shearer would not suffice. But defense counsel did not request a continuance or move for a mistrial. Instead defense counsel objected to admission of Exhibit 439 into evidence. Rule 16(d) vests broad authority in the district court to regulate discovery, including by "grant[ing] a continuance" where "a party failed to comply with th[e] rule," and the district court found no bad faith by the government in the late production of Exhibit 439. *See* Tr. 111 (Nov. 3, 2015 PM). Under the circumstances, even assuming a Rule 16 violation, appellants fail to establish the requisite prejudice to their

substantial rights for the court to conclude that the district court abused its discretion by not excluding Exhibit 439.[4]

**V.**

Sufficiency of the Evidence. Florence and Michael challenge the sufficiency of the evidence on multiple fronts, arguing that because the government failed to prove guilt beyond a reasonable doubt the district court erred in denying their motions for judgment of acquittal on various counts. We review "*de novo* the denial of a motion for acquittal, viewing the evidence in the light most favorable to the Government." *United States v. Stoddard*, 892 F.3d 1203, 1213 (D.C. Cir. 2018).

**A.**

Money Laundering and Conspiracy. Florence and Michael first claim that the government failed to prove beyond a reasonable doubt they had the requisite criminal intent to commit money laundering (Counts 16–22). To overcome this argument, the government had to present evidence from which a reasonable jury could find that the transactions were "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i).

---

[4] To the extent appellants argue the report was inadmissible under the Federal Rules of Evidence, this argument is insufficiently developed, *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005), and in any event, the objections come too late, *see United States v. White*, 116 F.3d 903, 923 (D.C. Cir. 1997).

The government based the seven money laundering convictions on seven transactions. All seven have the same basic structure: almost immediately after D.C. Medicaid deposited reimbursement funds into a Global intake account, Florence and Michael moved a substantially identical amount of money to a different Global corporate account (and, for one transaction, from that corporate account to an account owned by Florence's Maryland business, Flo-Diamond). From there, Florence and Michael quickly transferred the money to an account associated with one of two other corporations: CFC or Tri-Continental. Both Florence and Michael are signatories to every bank account involved in these transactions.

According to Florence and Michael, "[n]o rational juror could conclude" the charged "transactions were designed to conceal the nature or source of the funds" because each transaction "transferred money to accounts on which Appellants had signing authority" and "that were owned by companies that Appellants openly owned." Appellants' Br. 47–48. A fundamental logical disconnect lurks in this argument: even if Florence and Michael made no effort to conceal the money's *ownership*, they are still guilty if they tried to hide the money's *source*. *Cf. United States v. Warshak*, 631 F.3d 266, 320 (6th Cir. 2010) (finding sufficient evidence of intent to conceal "the exact source of the proceeds" even when "a number of the transactions were made under relatively open circumstances").

And, in fact, the evidence betrayed that Florence and Michael were attempting to conceal the money's provenance. CFC and Tri-Continental had no obvious connection to the home health care industry or, for that matter, any legitimate *raison d'être*. CFC's articles of incorporation listed its purpose

as "real estate investment" and Florence's son, Carlson Igwacho, as the company's resident agent. Carlson, however, testified that he never signed CFC's articles and that the company "didn't do any business." Tr. 67 (Oct. 28, 2015 PM). Records confirmed that — despite its putative concern with "real estate" — CFC owned a single piece of real property, purchased with Global funds, and had no significant expenditures associated with real estate. The record is devoid of evidence that CFC had any independent income or clients. Tri-Continental's story is much the same: although its listed purpose was the "import/export business," there is no evidence it ever imported or exported anything at all.

In a nutshell, the jury had ample basis to conclude that CFC and Tri-Continental were classic sham corporations, created for cleansing the money passing through them of any association with D.C. Medicaid. This court has recognized that such "funneling" of "illegal funds through various fictitious business accounts" is a hallmark of money laundering. *United States v. Adefehinti*, 510 F.3d 319, 323 (D.C. Cir. 2007) (quoting *United States v. Esterman*, 324 F.3d 565, 572 (7th Cir. 2003)).

Other hallmarks of an intent to conceal populate the broader landscape of Florence's and Michael's finances. For instance, Florence and Michael routinely engaged in "convoluted financial transactions" and "inter-company transfers" with no clear purpose. *Id.* (quoting *Esterman*, 324 F.3d at 572). All told, Florence and Michael controlled at least 122 bank accounts, only a fraction of which had any immediate connection to the health care industry. Nonetheless, over a five-year period, a towering ninety percent of the money passing through those accounts came from D.C. Medicaid (with Maryland Medicaid being one of the "main sources" of the

remaining ten percent). Tr. 131 (Nov. 3, 2015 AM). In that same period, Florence and Michael engaged in many transactions — indeed, over seven million dollars' worth — involving cashier's checks. As the government's agent testified, one advantage of cashier's checks, from a money launderer's perspective, is that the "recipient wouldn't know the actual source that's funding the check." Tr. 96 (Nov. 4, 2015 AM). Predictably, then, aspiring launderers "frequently use . . . cashier's checks to . . . make the transfers that are charged as money laundering." *United States v. Willey*, 57 F.3d 1374, 1386 n.23 (5th Cir. 1995). A reasonable jury could find based on the frequent use by Florence and Michael of such checks, considered alongside their various other financial maneuvers, that they sought to conceal the source of these funds.

Florence and Michael search in vain for aid from the handful of cases where this court has reversed money laundering convictions. First, they invoke the principle, articulated in *United States v. Law* and *United States v. Stoddard*, that "when faced with an innocent explanation sufficiently supported by the evidence to create a reasonable doubt about the defendant's guilt, the [g]overnment's burden is to present evidence sufficient to dispel that doubt." *Stoddard*, 892 F.3d at 1214 (quoting *Law*, 528 F.3d 888, 896 (D.C. Cir. 2008)). But neither of the two explanations offered by Florence and Michael for the transactions creates such doubt. First, they claim the companies were Global's "corporate siblings." That threadbare explanation raises more questions than it answers: why is Global, a company with real human clients and an independent revenue stream, sending millions of dollars to its "siblings" that apparently do no business at all? Second, Florence and Michael claim that they sought to avoid becoming victims of fraud themselves after someone attempted to draw a

fraudulent check on a Global account. This explanation is equally far-fetched: it might explain why they sought to move money out of the targeted account, but it does nothing to clarify why they created sham corporations.

Shifting gears, Florence and Michael turn to *United States v. Adefehinti* where this court held that the money laundering statute "has no application to the transparent division or deposit of" criminal proceeds. 510 F.3d at 322. The court applied that principle to the proceeds of a real estate fraud scheme in which the defendants flipped properties from fake sellers to fake buyers. *Id.* at 321. The charged transaction in *Adefehinti* began with a settlement check from one of these fictional sellers. *Id.* at 322. The check included the address of the property sold and identified the funds as the sale's proceeds. *Id.* After being endorsed to yet another fictional person (unconnected to the original real estate transaction), the same check was negotiated in person at a bank. *Id.* "Immediately thereafter," the proceeds were split four ways: into two accounts for which the defendants were signatories, into one unrelated account, and into cash. *Id.* Observing that these were "simple transactions that can be followed with relative ease," this court held that no juror could find an intent to conceal the source of the funds because "all the proceeds of the initial check were either cashed or went directly into accounts in the name of defendants or their associates without passing through any other person's account." *Id.* at 323 (internal quotation marks omitted).

The instant case differs fundamentally from *Adefehinti*. True, both involve fake entities beyond those participating in the initial fraud (there, the fake person negotiating the check; here, CFC or Tri-Continental). Crucially, however, in *Adefehinti* the check used to settle the transaction and later deposited into the defendants' accounts retained a visible link

to the source of the funds — the real estate transaction — until it entered the defendants' personal accounts. Not so here. As the investigating agent testified, once the money went into a CFC or Tri-Continental account, observers "would have absolutely no way of knowing that the money . . . came from the D.C. Government to Global Health Care." Tr. 75 (Nov. 4, 2015 AM). And although Florence and Michael also claim that, as in *Adefehinti*, the investigator admitted she could easily trace the transactions at issue, that position rests on a mischaracterization of the agent's testimony. True, the agent said that the necessary records were "readily accessible," Tr. 97 (Nov. 3, 2015 PM), but she also clarified that the job of actually untangling the Bikundis' complicated finances was laborious, requiring "many months . . . working on it seven days a week for probably eight, ten hours a day," Tr. 74 (Nov. 4, 2015 AM).

Having woven such an intricate web, Florence and Michael were doing more than just divvying up or spending the proceeds of fraud — conduct which might have given them a better claim for acquittal under *Adefehinti*. Instead, the government presented evidence on which a reasonable jury could find that Florence and Michael created an elaborate network of bank accounts involving two sham corporations and funneled money into them, effacing any obvious link to D.C. Medicaid or the health care business. Nor were these "simple transactions . . . followed with relative ease," 510 F.3d at 323; nothing in *Adefehinti* requires a jury to acquit when the defendants' schemes are vulnerable to dogged investigation. The government's evidence allowed a reasonable jury to find Florence and Michael had the intent to conceal, and the substantive money laundering convictions must therefore be affirmed.

Florence and Michael also challenge their money laundering conspiracy convictions (Count 15). The jury found that, as objects of the conspiracy, Florence and Michael planned to conceal the source of the funds, in violation of 18 U.S.C. § 1956, and to engage in transactions using the proceeds of their fraudulent conduct, in violation of 18 U.S.C. § 1957. As long as the evidence is sufficient to support one of those two objects, the court must affirm. *See United States v. Johnson*, 216 F.3d 1162, 1165 (D.C. Cir. 2000) ("[A] verdict cannot be overturned on the ground that the evidence is sufficient as to [only] one of [multiple charged acts]."). Florence and Michael's sole challenge to the concealment object entirely duplicates their argument on the substantive money laundering charges, namely that no reasonable juror could conclude the transactions were designed to conceal the nature or ownership of the D.C. Medicaid proceeds, and those arguments are equally unsuccessful in the conspiracy context. We therefore affirm the conspiracy convictions for the same reasons we affirm their substantive convictions, without reaching the § 1957 object.

**B.**

Exclusion-Based Health Care Fraud. Florence claims that the two counts premised on founding and operating Global despite her exclusion from federal health care programs — health care fraud in Count 13 and making false statements in a health care matter in Count 14 — cannot be sustained because the government failed to prove beyond a reasonable doubt that she knew about that exclusion.

As the parties agree, to convict on both counts, the government had to prove beyond a reasonable doubt that Florence had knowledge of her federal exclusion. *See* 18

U.S.C. § 1347(a) (Count 13); 42 U.S.C. § 1320a-7b(a)(3) (Count 14). Direct evidence of knowledge being rare, the government is likely to rely on circumstantial evidence. *United States v. Torres*, 894 F.3d 305, 311 (D.C. Cir. 2018). "Such indirect evidence might include a defendant's conduct before, during, or after the charged criminal acts, or the facts and circumstances known to [her] when [s]he acted." *Id.*

The government's strongest, even compelling, evidence is a Global employee's resume, seized from Florence's house, featuring two handwritten notations nearly side-by-side. Gov. Ex. 428 at 1. The first appears to be a reminder related to a different employee's resume. *Id.* ("Need Resume of Administrator (James Mbide)"). The second is the complete URL web address linking to the HHS's searchable online database of everyone who has been excluded from federal health care programs — a database that includes Florence's maiden name. *Id.* ("http://oig.hhs.gov/fraud/exclusions.asp"). Florence's own brother testified that the handwriting on the first notation, written in the same color as the URL address, belonged to Florence. Florence fights the obvious inference that she penned the second notation too, noting that her brother was unable to identify the URL handwriting as hers. Worse still, she claims, the jury heard no expert testimony at all about the handwriting. These arguments needlessly make the perfect the enemy of the good — the jury required no definitive identification or expert analysis to apply its own common sense. *Cf.* 28 U.S.C. § 1731 ("The admitted or proved handwriting of any person shall be admissible, for purposes of comparison, to determine genuineness of other handwriting attributed to such person."); Fed. R. Evid. 901(b)(3) ("A comparison with an authenticated specimen by an expert witness *or the trier of fact*" may satisfy "the requirement of authenticating or identifying an item of evidence." (emphasis

added)). Given our standard of review, the key question is what "rational juror[s]" could conclude, not what they had to conclude. *United States v. Williams*, 836 F.3d 1, 7 (D.C. Cir. 2016). And a reasonable juror — looking at the annotated resume found in Florence's house and armed with her brother's testimony — reasonably *could* find that Florence wrote the website address herself.

Having identified the handwriting as Florence's, the jury could then reasonably infer that Florence actually visited the listed site and typed her own maiden name into the database. Indeed, it is more difficult to reach the *opposite* conclusion, knowing as we do that Florence indisputably learned her eligibility was in serious jeopardy when she received a letter HHS telling her as much. That small step furnishes the final piece of the puzzle: typing her name into the database would have put Florence on actual notice that she was excluded from federal health care programs, including Medicaid.

The government correctly argues that Florence's habit of using her married name on health care-related forms (well before she was actually married) further supports the inference of guilty knowledge. It takes no logical leap to conclude that such a practice was designed to avoid triggering a hit when regulators cross-checked Florence's paperwork against the HHS database. As Florence points out, she deviated from this pattern on certain occasions, including once on Global's Medicaid provider application form. But a jury could reasonably find that these isolated incidents resulted from sloppiness rather than innocence. Florence also tells us that her use of "Bikundi" aligns with the Cameroonian custom of using a married name after a dowry has been paid. Superficially attractive, this explanation falls apart on closer scrutiny. Indeed, Florence signed one non-health care form (a mortgage

application) using her maiden name just days before her wedding, years after Michael supposedly paid the dowry. Combined with the resume notation, and viewing the evidence as favorably as possible for the government as we must, Florence's selective use of "Bikundi" on health care-related forms suggests she actually knew that using "Igwacho" might trigger a hit in the exclusion database. Added to the rest, the evidence is more than adequate to sustain Florence's exclusion-based convictions.

## C.

Health Care Fraud and Conspiracy. Michael claims there was insufficient evidence to support his conviction by the jury on health care fraud (Count 2) and the two objects of the health care fraud conspiracy (Count 1). Once again, it is common ground that both charges require proof Michael intended to defraud D.C. Medicaid. *See* 18 U.S.C. §§ 1347(a), 1349. Michael's position is that he had no such goal.

According to Michael, the district court should have inferred that he lacked the necessary intent based on a laundry list of things he did not *personally* do, including creating Global, recruiting or paying off bogus beneficiaries, or falsifying certain categories of documents. *See* Appellants' Br. 79. To call this argument cherry-picking would be a considerable understatement. Michael asks us to ignore heaps of relevant evidence showing that he intended to defraud D.C. Medicaid authorities. To hit just some of the highlights:

(1) Michael knew about and encouraged Global's efforts to fake or destroy records. For example, he supervised the progress of nurses who used white-out to alter patient records while auditors were on site waiting for those records. On

another occasion, he gave Florence's personnel file to a Global employee and instructed her to shred it just one day after auditors requested it.

(2) Regardless of whether Michael personally recruited or paid patients, he knew about and tolerated Global's practice of keeping patients ineligible for Medicaid benefits on its rolls. In fact, when one employee suggested reassessing and discharging some potentially unfit patients, Michael demurred, telling the employee to "put a business hat on [his] head." Tr. 22 (Oct. 19, 2015 AM).

(3) Michael knew that at least some Global employees lacked current qualifications required by D.C. regulations. He directed one staff member to erase and replace expired dates on employee certifications.

(4) Michael once argued with Florence about the quality of Global's document alteration, staking out the less-than-virtuous position that the results did not look real enough.

Given this evidence, Michael's claim that his case is just like *United States v. Rufai*, 732 F.3d 1175 (10th Cir. 2013), fails. There, the defendant, Olalekan Rufai, assisted a long-time acquaintance by setting up a company that the acquaintance concededly used to defraud Medicare. *Id.* at 1193. The Tenth Circuit reversed Rufai's health care fraud conviction, concluding the prosecution "presented no evidence that Mr. Rufai interacted with Medicare" or "knew that [his acquaintance] was planning to or did submit false bills for Medicare reimbursement," and Rufai was "never on site when [the company] was billing Medicare." *Id.* How different a position Michael finds himself in: the government's evidence showed Michael *did* interact with D.C. Medicaid, he *did* know

Global was falsifying records, and he *was* on site for billing and other fraudulent practices.

Perhaps sensing the uphill nature of his climb, Michael claims for the first time in his reply brief that multiple government witnesses who testified about his misdeeds at Global were "inherently incredible." Appellants' Reply Br. 32. As we must view the evidence in the light most favorable to the government, *Stoddard*, 892 F.3d at 1213, the bar Michael must clear to succeed on the inherently incredible argument, assuming it is not forfeited, is high indeed. Credibility determinations are properly entrusted to the jury. *See Johnson v. United States*, 426 F.2d 651, 655 (D.C. Cir. 1970) (en banc) ("Of all the issues which are in the highest order for a jury one is hard pressed to suggest one more firmly intended and more plainly suited for jury determination than that of credibility."). Michael misses that bar by a mile. His argument rests primarily on the fact that several of the government's witnesses were cooperating co-defendants. But here their cooperator status alone cannot mean that the testimony was necessarily "inherently incredible." His remaining objections amount to nothing more than quibbles that the government's evidence could have been even *stronger* on certain issues, but that tells us nothing about whether the evidence the government actually presented was strong enough to convict.

Simply put, the government provided ample evidence for the jury to find beyond a reasonable doubt that Michael intended to defraud D.C. Medicaid. That finding, in turn, suffices to sustain his substantive health care fraud conviction and at least one object of the health care fraud conspiracy count (namely, the very health care fraud that is the basis of the substantive conviction). As with the money laundering conspiracy, then, we need not address whether the evidence

was sufficient to support the second object the jury found (making false statements in a health care matter). *See Johnson*, 216 F.3d at 1165. Michael's health care fraud convictions must therefore be affirmed.

## VI.

Jury Instructions. Florence and Michael attempt two challenges to the jury instructions. First, they claim that the jury should have been charged that it had to agree unanimously on a single health care fraud incident. Second, Michael protests the district court's decision to give an instruction on aiding and abetting health care fraud. Because they failed to raise these issues in the district court, our review is for plain error. These arguments can only succeed if "(1) the District Court erred, (2) the error was clear or obvious, (3) the error affected [their] substantial rights, and (4) the error 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Moore*, 703 F.3d 562, 569 (D.C. Cir. 2012) (quoting *United States v. Olano*, 507 U.S. 725, 732–36 (1993) (second alteration in original)).

## A.

Unanimity. Florence and Michael claim that the district court erred in failing, without prompting, to instruct the jurors that they not only had to unanimously find Florence and Michael guilty of health care fraud in general, they also all had to agree on the *same* particular fraudulent claim for reimbursement. It is unclear whether they ground this objection in the Fifth Amendment's protection against duplicitous indictments or the Sixth Amendment's requirement for a unanimous jury verdict. Either way, however, the argument fails.

We do not consider this issue on a blank slate. In an unbroken line of precedent stretching back over thirty years, addressing both Fifth and Sixth Amendment concerns, this court has repeatedly declined to find plain error under similar circumstances. *United States v. Brown*, 892 F.3d 385, 393 (D.C. Cir. 2018) ("Because there is no precedent of the Supreme Court or this court requiring a district court to give a special unanimity instruction sua sponte in circumstances like those in this case, the district court's failure to do so cannot constitute plain error."); *United States v. Hurt*, 527 F.3d 1347, 1352–56 (D.C. Cir. 2008) ("The district court did not *plainly* err in failing to deliver a *sua sponte* special unanimity instruction."); *United States v. Klat*, 156 F.3d 1258, 1266–67 (D.C. Cir. 1998) ("We cannot conclude that it was plain error not to give a special unanimity instruction" where "an indictment charges more than one act."); *United States v. Mangieri*, 694 F.2d 1270, 1281 (D.C. Cir. 1982) ("We cannot conclude, however, that it was plain error not to give the more particularized [unanimity] instruction in this case.").

Florence and Michael have not pointed to any intervening legal developments that have changed that conclusion. They cite three cases to support their claim that this error was plain, but none help. Two of these cases — *United States v. Bruce*, 89 F.3d 886, 890 (D.C. Cir. 1996), and *United States v. Clark*, 208 F. App'x 137, 141 (3d Cir. 2006) — approved of a district court's decision to give a special unanimity instruction; neither addressed whether *failure* to give such an instruction would have been error. The third, *United States v. Adkinson*, 135 F.3d 1363, 1377–78 (11th Cir. 1998), does say, in dicta, that failing to give such an instruction was plain error. But *Adkinson* relies chiefly on *United States v. Gipson*, 553 F.2d 453 (5th Cir. 1977), which a plurality of the Supreme Court has cast

significant doubt on, *see Schad v. Arizona*, 501 U.S. 624, 635 (1991) ("We are not persuaded that the *Gipson* approach really answers the question."). The Supreme Court's misgivings ultimately led this circuit to reject *Gipson*'s reasoning in *United States v. Harris*, 959 F.2d 246, 255–56 (D.C. Cir. 1992) (per curiam). Regardless of whether *Schad* and *Harris* leave open the possibility that unanimity might be required under a theory different from *Gipson*'s, the district court here did not *plainly* err by failing, *sua sponte*, to apply out-of-circuit precedent with such a dubious pedigree. Accordingly, the failure to give a special unanimity instruction was not plain error.

**B.**

Aiding-and-Abetting Health Care Fraud. Michael further claims that the district court plainly erred when it gave an aiding and abetting instruction on the health care fraud count. But giving the instruction was not error — much less a plain one — because the evidence supported it. *See supra* pp. 30–31 (listing evidence of Michael's involvement in facilitating Global's health care fraud). Moreover, any error was harmless because the evidence was also sufficient to convict Michael as a principal. *See id*; *United States v. Smith*, 697 F.3d 625, 637 (7th Cir. 2012) (aiding and abetting instruction was not prejudicial where the "evidence overwhelmingly supported the jury's guilty verdict based on [the defendant] acting as the principal"). The aiding and abetting instruction provides no basis to overturn the jury's verdict.

**VII.**

Sentencing. Finally, Florence and Michael challenge their sentences, specifically the restitution orders, forfeiture

judgments, and sentencing enhancements imposed by the district court. We reject each of these challenges.

**A.**

Restitution. As restitution, the district court ordered Florence and Michael each to pay D.C. Medicaid approximately $80.6 million. This sum, the district court found, represented the total payments from D.C. Medicaid to Global — and thus the total loss suffered by D.C. Medicaid due to Florence and Michael's fraud. Florence and Michael were ordered to make restitution "jointly and severally" with each other and the other defendants, meaning each defendant is liable for D.C. Medicaid's entire loss, but D.C. Medicaid may recover no more than that amount from all of the defendants combined. *See* 18 U.S.C. § 3664(h); *Honeycutt v. United States*, 137 S. Ct. 1626, 1631–32 (2017); *United States v. Cano-Flores*, 796 F.3d 83, 95 (D.C. Cir. 2015). We review restitution orders for abuse of discretion. *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012).

The Mandatory Victims Restitution Act ("MVRA") directs federal courts to impose restitution when sentencing defendants convicted of various crimes, including certain frauds in which an identifiable victim suffered a monetary loss. 18 U.S.C. § 3663A(c)(1). In such cases, the district court "shall order" the defendant to "make restitution to [each] victim of the offense" in "the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* §§ 3663A(a)(1), 3664(f)(1)(A). Restitution is "essentially compensatory," not punitive: it simply "restore[s] a victim, to the extent money can do so, to the position [the victim] occupied before sustaining injury." *Fair*, 699 F.3d at 512 (quoting *United States v.*

*Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006)). Thus, restitution is "limited to the actual, provable loss suffered by the victim and caused by the offense conduct." *Id.* The burden of proving "the amount of the loss" is borne by the government, but the "burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e). The amount of restitution ordered by a district court must be supported by a preponderance of the evidence. *Id.*

Florence and Michael contest the amounts of their restitution. They argue that the government did not carry its burden of proving loss because the evidence failed to distinguish between fraudulent services and "legitimate services" performed by Global. Appellants' Br. 85–87. By legitimate services, Florence and Michael appear to mean the necessary services that Global personal care aides actually provided to real Medicaid beneficiaries. *See id.* at 85. Amounts paid for such services, they argue, were not "losses" suffered by D.C. Medicaid. After all, in exchange for such payments, beneficiaries received necessary services covered by D.C. Medicaid, and if the payments had not gone to Global, they simply would have gone to a different provider. Thus, because D.C Medicaid did not lose the entire $80.6 million it paid to Global, restitution in that amount violates the MVRA. *See id.* at 86–88.

As the district court acknowledged, there was testimony presented at trial about legitimate services being both needed and provided by Global personal care aides to D.C. Medicaid beneficiaries. But the district court found that "the defendants' fraud makes it impossible to determine what, if any, services were legitimately rendered, let alone what the [values] associated with those legitimate services are." Tr. 34 (June 1,

2016 AM). "Not only were the time sheets falsified, but the defendants also supervised and directed the creation of phony employee background checks, fake nurse notes, and fraudulent plans of care." *Id.* This "rampant fraud . . . permeated Global's operations," potentially infecting "every patient and employee file there." *Id.* at 36.

Due to the pervasive fraud, Florence and Michael were "in a much better position than the government to ascertain the particular facts at issue," specifically whether any services were truly legitimate. *Fair*, 699 F.3d at 515. Indeed, on this record, only they know the full extent of their fraudulent operations, so they were far better-equipped to identify any services that were unaffected by fraud in licensing, care plans, provision, or billing.

In such circumstances, although the ultimate burden of proving loss always remains with the government, the MVRA authorizes the district court to place on the defendant a burden of producing evidence of any legitimate services. 18 U.S.C. § 3664(e); *see Fair*, 699 F.3d at 515 (citing *United States v. Archer*, 671 F.3d 149, 173 (2d Cir. 2011)). If the defendant carries this burden of production, the prosecution must then prove the fraudulent nature of those services. *See Archer*, 671 F.3d at 173. But, if the defendant does not produce evidence of legitimate services, the prosecution need not show that each and every service was fraudulent. Rather, the prosecution may rely on the existence of a pervasive fraud to argue that all services were infected by fraud in some way, and therefore that payments for all services represent loss under the MVRA. *See id.* at 173–74. The district court then determines the amount lost by a preponderance of the evidence. 18 U.S.C. §§ 3663A(a)(1), 3664(e). This approach helps ensure that fraudsters do not benefit from the comprehensive alteration of

their own records. *See Fair*, 699 F.3d at 515; *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012).

Here, against significant evidence of pervasive fraud, Florence and Michael failed to produce any specific evidence of the value of any legitimate services. Indeed, the district court found that they "haven't even attempted to undertake that daunting task because they likely can't tell" whether any services were legitimate. Tr. 35 (June 1, 2016 AM). "Certainly, no witness at trial . . . who worked at Global was able to say which employee or patient files might have been completely legitimate and clean of fraud." *Id.* Because Florence and Michael did not carry their burden of production as to any legitimate services, the district court properly concluded that the $80.6 million in payments from D.C. Medicaid to Global constituted loss under the MVRA.

**B.**

Forfeiture. The district court also ordered Florence and Michael each to forfeit approximately $39.7 million (for the health care fraud offenses) and $40.0 million (for the money laundering offenses) to be assessed concurrently, meaning that money forfeited by Florence counts toward her forfeiture judgments for both health care fraud and money laundering, and the same goes for Michael. In total, therefore, each must forfeit approximately $40.0 million.

To calculate the forfeitures, the district court first found that Global's Medicaid proceeds of approximately $80 million (less a few minor deductions) were subject to forfeiture under the statutes for both health care fraud, 18 U.S.C. § 982(a)(7), and money laundering, *id.* § 982(a)(1). The court then divided the approximately $80 million equally between Florence and

Michael, reasoning that they were "equally responsible" and should each forfeit half of the funds because they "jointly obtained . . . the illicit funds through their shared management and control over Global, and they effectively treated the proceeds as joint property." Tr. 27–28 (Apr. 27, 2016 AM). The court also ordered Florence and Michael to forfeit specific pieces of property, including cash, vehicles, jewelry, and real property, with the values of the forfeited properties to be credited on a fifty-fifty basis toward each of their forfeiture money judgments. Reviewing such forfeiture judgments, we examine the district court's fact finding for clear error and its legal interpretations *de novo*. *United States v. Emor*, 785 F.3d 671, 676 (D.C. Cir. 2015).

Florence and Michael contest the forfeiture judgments in three ways; none is persuasive. First, they argue that the relevant statutes do not authorize forfeiture of the entire $80 million. A defendant convicted of health care fraud must forfeit property "that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the [health care fraud] offense." 18 U.S.C. § 982(a)(7). This does not cover Global's total proceeds, they maintain, because the Medicaid payments for certain legitimate services were not connected to the health care fraud offenses.

Their argument overlooks the breadth of the forfeiture statute: "Gross proceeds traceable to" the fraud include "the total amount of money brought in through the fraudulent activity, with no costs deducted or set-offs applied." *United States v. Poulin*, 461 F. App'x 272, 288 (4th Cir. 2012); *cf. United States v. DeFries*, 129 F.3d 1293, 1313–15 (D.C. Cir. 1997) (rejecting the argument that forfeiture of RICO "proceeds" should be reduced to reflect defendants' tax payments). And whereas other forfeiture statutes allow credit

for "lawful services," *see, e.g.*, 18 U.S.C. § 981(a)(2)(B), the statute for health care fraud does not. Here, the district court found that Global "would not have operated *but for* [each] defendant's fraud," and that the approximately $80 million "was *only* paid due to the defendants' persistent and rampant fraudulent conduct." Preliminary Order of Forfeiture ("Florence POF"), *United States v. Florence Bikundi*, No. 1:14-cr-0030-1 (D.D.C. Apr. 22, 2016), ECF No. 493 at 3 (emphasis added); Preliminary Order of Forfeiture ("Michael POF"), *United States v. Michael Bikundi*, No. 1:14-cr-0030-2 (D.D.C. Apr. 22, 2016), ECF No. 494 at 3 (emphasis added); Tr. 27 (Apr. 27, 2016 AM) (emphasis added); *see also* Tr. 33 (June 1, 2016 AM) (incorporating Tr. 25 (Apr. 27, 2016 AM): Global's "continuing operations were maintained based on fraudulent records in employee and patient files and fraudulent timesheets submitted for reimbursement"). Because the pervasive fraud was integral to each and every Medicaid payment to Global, the district court properly determined that the total payments "constitute[d]" or were "derived, directly or indirectly" from "gross proceeds traceable" to each of their health care fraud offenses. 18 U.S.C. § 982(a)(7).

Florence and Michael also argue that neither of their concurrent forfeitures for money laundering are authorized by statute. A defendant convicted of money laundering must forfeit "any property, real or personal, involved in such offense, or any property traceable to such property." *Id.* § 982(a)(1). The district court calculated these forfeitures by starting with approximately $80.6 million, *i.e.*, "the total value of D.C. Medicaid payments" deposited into three Global Intake Accounts. Florence POF at 4; Michael POF at 4. The district court then reduced that sum by the balance remaining in the Global Intake Accounts, which represented "the value of property that was not transferred out of a Global Intake

Account into other financial accounts controlled by the defendants." *Id.* This left a "forfeiture amount" of approximately $80 million ($79,979,712.05, to be exact), which the court divided equally between Florence and Michael by ordering each to forfeit approximately $40 million. *Id.*

Florence and Michael challenge this calculation by pointing out that the government showed only that seven transactions (amounting to $2.61 million) constituted actual money laundering. This argument was not raised in the district court, so we review its merits for plain error. *See Brown*, 892 F.3d at 397.

This argument ignores that the money laundering forfeiture statute applies not only to funds that are actually laundered — here, the $2.61 million — but also to those more broadly "involved in" money laundering. 18 U.S.C. § 982(a)(1). The statute sweeps broadly because "money laundering largely depends upon the use of legitimate monies to advance or facilitate the scheme." *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (quoting *United States v. Tencer*, 107 F.3d 1120, 1135 (5th Cir. 1997)). Although we have not addressed the issue, other circuits have held that funds "involved in" money laundering include those that "facilitate" the money laundering scheme, which encompasses unlaundered funds when they are transferred "in order to conceal the nature and source" of fraudulent proceeds. *See id.*; *United States v. McGauley*, 279 F.3d 62, 76–77 (1st Cir. 2002); *United States v. Baker*, 227 F.3d 955, 969–70 (7th Cir. 2000); *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998); *Tencer*, 107 F.3d at 1134–35. The government offered evidence that Florence and Michael used unlaundered funds to facilitate the money laundering conspiracy and conceal their proceeds by, for example, "shuffl[ing] fraud proceeds and

commingled untainted funds through multiple corporate, personal, investment, trust, and international accounts" and "utiliz[ing] commingled funds in corporate accounts in the name of CFC and Tri-Continental to create the appearance that they had a legitimate real estate investment business and an import-export business." Gov't Mot. for Preliminary Order of Forfeiture, *United States v. Florence Bikundi*, No. 1:14-cr-0030-1 (D.D.C. Jan. 21, 2016), ECF No. 426 at 18–20; Gov't Mot. for Preliminary Order of Forfeiture, *United States v. Michael Bikundi*, No. 1:14-cr-0030-2 (D.D.C. Jan. 21, 2016), ECF No. 427 at 18–20. Based on this evidence, the district court found that the funds transferred out of Global's Intake Accounts were "involved in" the offense because they facilitated the money laundering conspiracy, and the funds were thus subject to forfeiture under § 982(a)(1). Florence POF at 4; Michael POF at 4. Given the lack of controlling precedent in our circuit and the state of the law elsewhere, we cannot say the district court plainly erred.

Second, Florence and Michael contend that the forfeiture judgments are inconsistent with *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), because they impose joint and several liability. There, the Supreme Court held that the drug-crime forfeiture statute does not authorize joint and several liability; instead, such forfeiture "is limited to property the defendant himself actually acquired as the result of the [drug] crime." *Id.* at 1635. Florence and Michael maintain that *Honeycutt*'s logic extends to the forfeiture statutes at issue here, limiting their forfeitures to the criminal proceeds personally attributable to each defendant and "no other." Appellants' Br. 89–90 & n.37 (citing *United States v. Sanjar*, 876 F.3d 725, 749 (5th Cir. 2017), which applied *Honeycutt* in the context of a forfeiture under § 982(a)(7)).

The forfeiture statutes at issue in this case arguably define forfeitable property more broadly than that in *Honeycutt*, so it is unclear whether *Honeycutt*'s logic extends to Florence's and Michael's forfeitures. *Compare* 18 U.S.C. § 982(a)(1), (7) (subjecting to forfeiture the property "involved in" money laundering and the "gross proceeds traceable to" a health care fraud), *with* 21 U.S.C. § 853(a)(1) (subjecting to forfeiture the drug-crime proceeds "obtained" by a defendant). But we need not resolve that question because the forfeitures here do not impose joint and several liability. In calculating the forfeitures under both § 982(a)(1) and § 982(a)(7), the district court found that both Florence and Michael were integrally involved with Global's fraudulent operations, and thus they "jointly obtained" and were "equally responsible for" the criminal proceeds. Tr. 27–28 (Apr. 27, 2016 AM). Based on that finding, the court ordered each defendant to forfeit half of the criminal proceeds. That's not joint and several liability, but rather an equal division of liability between the two masterminds of the conspiracy. And since Florence and Michael "effectively treated the proceeds as joint property," *id.*, ordering them each to forfeit half of the proceeds reasonably ensured that the forfeiture judgments did not exceed an amount that each defendant "actually acquired," *Honeycutt*, 137 S. Ct. at 1635.

Third, Florence and Michael argue that the forfeiture judgments violate the Eighth Amendment, which prohibits "excessive fines." U.S. Const. amend. VIII. "[A]t the time the Constitution was adopted, the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense." *United States v. Bajakajian*, 524 U.S. 321, 327 (1998) (internal quotation marks omitted). The Excessive Fines Clause thus "limits the government's power to extract payments, whether in cash or in kind, as punishment for some

offense." *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) (quoting *Bajakajian*, 524 U.S. at 328). "Our analysis under the Excessive Fines Clause entails two steps: (1) determining whether the government extracted payments for the purpose of punishment; and (2) assessing whether the extraction was excessive. The first step determines whether the Excessive Fines Clause applies, and the second determines if the Clause was violated." *Consol. Commc'ns of Cal. Co. v. FCC*, 715 F. App'x 13, 15 (D.C. Cir. 2018) (unpublished per curiam) (citation omitted); *see Bajakajian*, 524 U.S. at 328, 334.

At the first step, the district court held that the Clause does not apply because the forfeitures were not punitive, but rather "purely remedial." Tr. 32–33 (Apr. 27, 2016 AM). Florence and Michael argue that this was error, *see* Appellants' Br. 91–92, but we need not address the issue. For even if the forfeitures are punitive and thus the Excessive Fines Clause applies, the forfeitures do not run afoul of the Clause at the second step.

A punitive forfeiture violates the Excessive Fines Clause "if it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. At the outset, we "note the Court's admonition that, though this is a constitutional injury, 'judgments about the appropriate punishment for an offense belong in the first instance to the legislature.'" *Collins v. SEC*, 736 F.3d 521, 527 (D.C. Cir. 2013) (quoting *Bajakajian*, 524 U.S. at 336). In authorizing large forfeiture judgments for the crimes of which Florence and Michael were convicted, Congress determined that the offenses are grave, which carries significant weight in our analysis. *See id.* Moreover, the total forfeiture levied against Florence and Michael for health care fraud corresponds one-to-one to the amount they derived from their fraud, and the total forfeiture levied concurrently for money laundering likewise corresponds

one-to-one to funds involved in that crime. Given the close match between the amounts of the illicit funds and the ensuing judgments, the penalties were not "grossly disproportional" to Florence's and Michael's crimes.

*Bajakajian* confirms this conclusion. There, the Supreme Court discussed four factors: (1) the essence of the crime; (2) whether the defendant fit into the class of persons for whom the statute was principally designed; (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the defendant's conduct. *See Bajakajian*, 524 U.S. at 337–40; *see also United States v. Varrone*, 554 F.3d 327, 331 (2d Cir. 2009) (describing the four factors). These factors "hardly establish a discrete analytic process," but we have "review[ed] them briefly to see if there are danger signals" when upholding a civil penalty challenged under the Excessive Fines Clause. *Collins*, 736 F.3d at 526–27.

All four factors confirm that the forfeitures imposed against Florence and Michael do not violate the Excessive Fines Clause. (1) The essence of their crime was grave. They personally orchestrated a sprawling fraud involving falsified licenses, timesheets, and bills. And far from being a one-off violation, the scheme lasted for years and involved numerous misdeeds. (2) Florence and Michael fall squarely within the class of criminals targeted by the relevant forfeiture statutes: health care fraudsters and money launderers. (3) The statutes of conviction and the Sentencing Guidelines authorize heavy prison sentences and fines. *See* 18 U.S.C. § 1347(a) (10-year maximum prison sentence for health care fraud); *id.* § 1956(a)(1) (20-year maximum sentence for money laundering, along with a fine of twice the value of the property involved in the money laundering transaction); U.S.S.G. §§ 2B1.1, 3B1.1, 3B1.3, 2S1.1, 5A. (4) Florence and Michael

caused significant harm by defrauding D.C. Medicaid out of millions of dollars meant for the needy. Such harm is unlike that deemed "minimal" in *Bajakajian*, where the defendant failed to follow a reporting requirement, "[t]here was no fraud on the United States, and [the defendant] caused no loss to the public fisc." 524 U.S. at 339.

Florence and Michael ask us to consider one more factor: their ability to pay the forfeitures. On their telling, the forfeitures are grossly disproportional because the forfeitures are "so large that Appellants will surely never be able to pay them," and they effectively "sentence Appellants to lifetimes of bankruptcy." Appellants' Br. 91.[5] Because Florence and Michael did not raise this argument in the district court, we will reverse only if the district court plainly erred, meaning that the error must be "obvious" or "clear under current law." *Hurt*, 527

---

[5] Although most circuits assess proportionality without considering a defendant's ability to pay, *see, e.g.*, *United States v. Beecroft*, 825 F.3d 991, 997 n.5 (9th Cir. 2016); *United States v. Smith*, 656 F.3d 821, 828–29 (8th Cir. 2011); *United States v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1311 (11th Cir. 1999), appellants' argument draws support from the First Circuit, *see United States v. Levesque*, 546 F.3d 78, 84–85 (1st Cir. 2008), and from scholarship arguing that the original meaning of the Excessive Fines Clause prohibits fines so severe as to deprive a defendant of his or her "contenement" or livelihood, understood as the ability to secure the necessities of life, *see* Nicholas M. McLean, *Livelihood, Ability to Pay, and the Original Meaning of the Excessive Fines Clause*, 40 Hastings Const. L.Q. 833, 854–72 (2013). In a similar vein, the Supreme Court recently described the Clause as tracing its "venerable lineage" back to Magna Carta, which safeguarded the "contenement" of Englishmen and "required that economic sanctions . . . not be so large as to deprive an offender of his livelihood." *Timbs*, 139 S. Ct. at 687–88 (citations, internal quotation marks, and brackets omitted).

F.3d at 1356; *United States v. Sumlin*, 271 F.3d 274, 281 (D.C. Cir. 2001). That did not occur here. The Excessive Fines Clause does not make obvious whether a forfeiture is excessive because a defendant is unable to pay, and "[n]either the Supreme Court nor this court has spoken" on that issue. *Hurt*, 527 F.3d at 1356; *see Timbs*, 139 S. Ct. at 688 (noting that the Supreme Court has "tak[en] no position on the question whether a person's income and wealth are relevant considerations in judging the excessiveness of a fine" (citing *Bajakajian*, 524 U.S. at 340 n.15)). Thus, the district court did not plainly violate the Excessive Fines Clause by ordering forfeitures without considering Florence's and Michael's ability to pay them.

## C.

Sentencing Enhancements. Finally, Florence and Michael challenge four of the sentencing enhancements imposed by the district court. Both challenge the enhancements for (1) committing crimes involving a loss of approximately $80 million and (2) abusing positions of trust. Michael challenges his enhancement for (3) playing a managerial role in the crimes, and Florence contests hers for (4) violating an administrative order. Upon appeal of such enhancements, "[p]urely legal questions are reviewed *de novo*; factual findings are to be affirmed unless clearly erroneous; and we are to give due deference to the district court's application of the [sentencing] guidelines to facts." *United States v. Vega*, 826 F.3d 514, 538 (D.C. Cir. 2016) (quoting *United States v. Day*, 524 F.3d 1361, 1367 (D.C. Cir. 2008)). Due deference "presumably falls somewhere between *de novo* and clearly erroneous." *United States v. Bisong*, 645 F.3d 384, 397 (D.C.

Cir. 2011) (quoting *United States v. Kim*, 23 F.3d 513, 517 (D.C. Cir. 1994) (alterations omitted)).

**1.**

Loss Amount. First, the enhancements for loss. The Sentencing Guidelines provide that, for crimes such as Florence and Michael's fraud, the offense level is to be increased based on the loss involved. *See* U.S.S.G. § 2B1.1(b)(1). The district court increased Florence's and Michael's respective offense levels by twenty-eight points based on a loss of approximately $80 million — the total amount D.C. Medicaid paid to Global. *See* U.S.S.G. § 2B1.1(b)(1)(M) (24-point increase when loss exceeds $65 million); *id.* § 2B1.1(b)(7) (additional 4-point increase when loss exceeds $20 million and the offense involves a federal health care program). Reprising its earlier argument against the MVRA loss, Florence and Michael contend that D.C. Medicaid did not suffer a Guidelines loss of $80 million because Global performed some legitimate services. Just as this argument failed earlier, it fails here. The district court properly applied the Guidelines' rules for calculating loss, particularly the general rule, the special rule, and the credit rule.

Under the "general rule" of Guidelines § 2B1.1, loss is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense"; intended loss is "the pecuniary harm that was intended to result from the offense." *Id.* cmt. n.3(A)(i)–(ii). The Guidelines also provide a "special rule" that "shall be used to assist in determining loss" when sentencing defendants "convicted of a Federal health care offense involving a Government health care program." *Id.* cmt. n.3(F)(viii). There, "the aggregate dollar amount of fraudulent

bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss." *Id.* This evidence is "sufficient to establish the amount of the intended loss, if not rebutted." *Id.*

Here, the district court properly found that the pervasive fraud at Global meant that approximately $80 million was fraudulently billed. Indeed, as discussed already in Sections VII.A and B, Global "would not have operated but for [each] defendant's fraud," and approximately $80 million "was only paid due to the defendants' persistent and rampant fraudulent conduct." Florence POF at 3; Michael POF at 3; Tr. 27 (Apr. 27, 2016 AM). That amount constituted "the aggregate dollar amount of fraudulent bills submitted to the Government health care program." U.S.S.G. § 2B1.1 cmt. n.3(F)(viii). Under the special rule, these fraudulent billings are "sufficient to establish the intended loss," unless rebutted, which Florence and Michael made no effort to do. *Id.* Approximately $80 million was therefore the appropriate Guidelines loss.[6]

Florence and Michael object that they performed some legitimate services, so the loss calculation should have been reduced under what we will call the Guidelines' "credit rule." *See* Appellants' Br. 95–96. This rule directs that "loss shall be reduced by . . . the fair market value of . . . the services rendered . . . by the defendant or other persons acting jointly

---

[6] One clarifying point: although Global *billed* D.C. Medicaid for approximately $81 million, the district court calculated the "fraudulent bills" as $80 million based on the amount D.C. Medicaid *paid* to Global. That may have been an error because only fraudulent bills, not actual payments, establish intended loss under the special rule. *See* U.S.S.G. § 2B1.1 cmt. n.3(F)(viii). Any error, however, was harmless because it resulted in a lower loss calculation: approximately $80 million instead of $81 million.

with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. n.3(E)(i).

The government suggests that the credit rule is overridden by the special rule for calculating loss in health care fraud cases. *See* Appellee's Br. 112–13. On this point, however, we agree that both rules apply in health care fraud cases. The special rule states that it applies "[n]otwithstanding" the general rule, but makes no such exception for the credit rule. U.S.S.G. § 2B1.1 cmt. n.3(F). Furthermore, "the drafters of [the loss rules] knew how to indicate that no credits would be permitted." *United States v. Nagle*, 803 F.3d 167, 182 (3d Cir. 2015). For example, the special rule for misrepresentation schemes requires that loss be calculated without using the credit rule to reduce loss according to the value of the misrepresented services. *See* U.S.S.G. § 2B1.1 cmt. n.3(F)(v). But not so for health care fraud cases. Because "the Sentencing Commission speaks clearly when it wants to exempt specific types of cases from the default practice of crediting against loss the value of services rendered by the defendant," the credit rule applies here. *United States v. Harris*, 821 F.3d 589, 605 (5th Cir. 2016); *accord Nagle*, 803 F.3d at 182.

Even under the credit rule, Florence and Michael fail to show that the loss calculation should be reduced by the value of services rendered. U.S.S.G. § 2B1.1 cmt. n.3(E)(i). The overall burden of proving loss under the Guidelines always remains with the government. *See In re Sealed Case*, 552 F.3d 841, 846 (D.C. Cir. 2009). But for the same reasons that the district court may place on a defendant the burden of producing evidence of legitimate services when calculating restitution, *see supra* Section VII.A, the district court may impose on a defendant the burden of producing evidence of "services rendered" with a market value warranting credit under the

credit rule. As we previously explained, Florence and Michael did not produce evidence of such services with any specificity, *see id.*, so the district court properly refused to use the credit rule to reduce the loss calculation. We therefore affirm the Guidelines loss calculation and the accompanying enhancements.

**2.**

Abuse of Trust. Florence and Michael also challenge the enhancements they received for abusing positions of trust, which increased their offense levels by two points. This enhancement applies if a defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. A position of trust is "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." *Id.* cmt. n.1. "Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature," and the position "must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult)." *Id.* We have embraced the following factors as guides in determining whether a defendant held a position of trust:

> The extent to which the position provides the freedom to commit a difficult-to-detect wrong, and whether an abuse could be simply or readily noticed; defendant's duties as compared to those of other employees; defendants' level of specialized knowledge;

defendant's level of authority in the position; and the level of public trust.

*United States v. Robinson*, 198 F.3d 973, 977 (D.C. Cir. 2000) (quoting *United States v. Shyllon*, 10 F.3d 1, 5 (D.C. Cir. 1993)).

Until now, we have not addressed "whether those who seek payment from the government for the provision of medical services" — like Florence and Michael — "occupy positions of trust vis-à-vis the government." *United States v. Wheeler*, 753 F.3d 200, 209 (D.C. Cir. 2014). The majority of circuits that have considered the issue have held that certain providers may, *id.* at 209–10 (citing four other circuits), but the Eleventh Circuit has disagreed, *see United States v. Williams*, 527 F.3d 1235, 1250 (11th Cir. 2008).

Consistent with the majority of circuits, we hold that Florence and Michael occupied and abused a position of trust. DHCF depended on Florence and Michael to properly exercise substantial discretion, which is the touchstone of our inquiry under the Sentencing Guidelines. *See* U.S.S.G. § 3B1.3 cmt. n.1. For example, although DHCF has some ability to police home care agencies through licensing and audits, DHCF entrusts agencies like Global with ensuring that actual beneficiaries receive adequate services from qualified aides based on appropriate plans of care, and DHCF relies on the leaders of such agencies to maintain records and submit bills that accurately reflect such services. These responsibilities are not rote paperwork-processing. Rather, they call for decisions and judgments that occur outside of DHCF's "supervision" and receive considerable "deference" from DHCF, *id.*, leaving the leaders of home care agencies with ample "freedom to commit a difficult-to-detect wrong," *Robinson*, 198 F.3d at 977

(internal quotation marks omitted). In exercising their discretion, the leaders of home care agencies are invested with weighty duties and a high "level of public trust," *id.*, because their actions affect the receipt of necessary health care by individual Medicaid beneficiaries and, more generally, the continuing effectiveness of the D.C. Medicaid program. Instead of honoring that public trust, Florence and Michael used their positions to commit and conceal numerous offenses.

Florence and Michael claim that the enhancement can't apply because they had only "an arm's-length business relationship" with D.C. Medicaid, not the "fiduciary relationship" commonly present in abuse-of-trust cases, such as those involving doctors or other medical professionals. Appellants' Br. 102, 106. But the plain text of the Sentencing Guidelines and their application notes do not require a fiduciary relationship. Rather, they examine whether a defendant's position was characterized by "professional or managerial discretion," U.S.S.G. § 3B1.3 cmt. n.1, which may be exercised by defendants who are not physicians and run commercial entities, such as Global, *see, e.g.*, *United States v. Adebimpe*, 819 F.3d 1212, 1219 (9th Cir. 2016) (applying the enhancement to medical equipment suppliers because "Medicare entrusted [them] with 'substantial discretionary judgment' in selecting the proper equipment, and gave them 'considerable deference' in submitting claims that accurately reflected patients' medical needs" (citing U.S.S.G. § 3B1.3 cmt. n.1)); *United States v. Willett*, 751 F.3d 335, 344–45 (5th Cir. 2014) (medical equipment supplier); *United States v. Bolden*, 325 F.3d 471, 504–05 (4th Cir. 2003) (nursing home administrator); *United States v. Gieger*, 190 F.3d 661, 665 (5th Cir. 1999) (ambulance company owners).

Florence and Michael also assert that they did not abuse a position of trust because they did not submit bills directly to DHCF, but rather used medical billing companies owned by Edward Mokam. In support, Florence and Michael invoke an Eleventh Circuit case, *United States v. Garrison*, which held that a fiscal intermediary made the defendant's relationship with Medicare "too attenuated" for the abuse-of-trust enhancement. 133 F.3d 831, 842 (11th Cir. 1998). Because this argument is made for the first time on appeal, we review for plain error. *See Brown*, 892 F.3d at 397.

We find no plain error because the case they invoke is from another circuit and it is easily distinguishable from this case. In *Garrison*, the intermediary was "charged with the responsibility of ensuring that Medicare payments [were] made to healthcare providers only for covered services." 133 F.3d at 834. To that end, the intermediary shouldered a "specific responsibility . . . to review and to approve requests for Medicare reimbursement before submitting those claims to Medicare for payment," and the intermediary could reject or adjust claims, including when it determined that the claims involved fraud or willful misrepresentation. *Id.* at 834 & n.5, 841. The intermediary here, Mokam, lacked comparable obligations. He submitted bills based on the timesheets and documents provided by Global, which he assumed were correct. Mokam was not responsible for investigating whether services were legitimate, nor certifying that the information contained in the bills was truthful. If anything, this case resembles *United States v. Adebimpe*, which involved an intermediary who performed only "limited review," *i.e.*, processing and certifying claims "as a matter of course, rather than scrutinizing their validity." 819 F.3d 1212, 1220 (9th Cir. 2016). Distinguishing *Garrison*, the Ninth Circuit explained that the "mere presence" of such an intermediary "d[id] not

destroy the defendants' position of trust with respect to Medicare." *Id.* This case is likewise distinguishable from *Garrison*, which in any event is out-of-circuit authority. The district court therefore did not plainly err in applying the abuse-of-trust enhancement despite Mokam's involvement.

Finally, Florence and Michael point out that the Guidelines prohibit the enhancement when "an abuse of trust . . . is included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3. Their federal health care offenses, they say, already accounted for an abuse of trust. *See* U.S.S.G. § 2B1.1(b)(7). We again review for plain error. *See Brown*, 892 F.3d at 397.

Florence and Michael rely once more on *Garrison*, which held in the alternative that the enhancement could not be used when the conduct that formed the abuse of trust was also the basis for the underlying fraud. *See* 133 F.3d at 843. But the Eleventh Circuit itself has since called *Garrison*'s conduct-based approach "dicta." *United States v. Bracciale*, 374 F.3d 998, 1007, 1009 (11th Cir. 2004). And other circuits have applied the enhancement to defendants convicted of Medicare and Medicaid fraud, rejecting the argument that "an abuse of trust is the essence of the crime and therefore is already accounted for in the base level offense." *United States v. Ntshona*, 156 F.3d 318, 320 (2d Cir. 1998) (per curiam); *see also United States v. Loving*, 321 F. App'x 246, 249 (4th Cir. 2008) (unpublished per curiam). Given this state of the law, plain error did not occur. We affirm the abuse-of-trust enhancements.

**3.**

Managerial Role. Although both Florence and Michael received enhancements for their aggravating roles in the conspiracy, only Michael challenges the enhancement on appeal. Michael's offense level was increased by three points under the managerial-role enhancement, which applies if the defendant "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). Applying this enhancement, courts "should consider" the following factors:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* cmt. n.4. No single factor is dispositive, but all defendants receiving the enhancement "must exercise some control over others." *United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014) (quoting *United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998)).

Michael argues that he played "a lesser role" at Global and did not control Global employees or manage the conspiracy. Appellants' Br. 107. But as explained in Section V, that is not what the evidence showed. To the contrary, Michael managed and supervised the health care fraud and money laundering conspiracies through his control of Global employees. He was,

as the district court found, "integrally involved as a boss at Global." Tr. 54 (June 1, 2016 AM).

**4.**

Violation of Administrative Order. Finally, Florence contests the two-level enhancement she received because her fraud involved a knowing "violation of [a] prior, specific . . . administrative order," specifically the HHS order excluding her from participating in federal health care programs. U.S.S.G. § 2B1.1(b)(9)(C) & cmt. n.8(c). To challenge this enhancement, Florence reiterates that she did not know she had been excluded. *See* Appellants' Br. 107. The evidence, however, supported that Florence knew. *See supra* Section V.B.

For the foregoing reasons, we affirm the convictions and sentences of Florence and Michael.

*So ordered.*

ROGERS, *Circuit Judge*, concurring: I join the court's opinion and write separately regarding the government's failure to comply with Rule 16 of the Federal Rules of Criminal Procedure.

Rule 16 requires the government to produce, upon a defendant's request, "books, papers, documents, data, photographs, tangible objects, buildings or places," if the item is "within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intended to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Fed. R. Crim. Pro. 16(a)(1)(E). Over time, Rule 16 has been amended to provide for broader discovery in criminal prosecutions. Adv. Comm. Note to 1993 Amendment; Adv. Comm. Note to 1966 Amendment; *see also* 2 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 251 (4th ed. 2018). The Supreme Court and this court have recognized that broad discovery promotes informed plea decisions, minimizes unfair surprise, and helps ensure guilt is accurately determined. *Wardius v. Oregon*, 412 U.S. 470, 473–74 (1973); *United States v. Marshall*, 132 F.3d 63, 69–70 (D.C. Cir. 1998); *United States v. Machado-Erazo*, 901 F.3d 326, 339–40 (D.C. Cir. 2018) (Rogers, J., concurring); *see also* Adv. Comm. Notes to 1993 and 1974 Amendments.

In determining the scope of obligations under Rule 16, this court has looked to "the plain language" of the Rule. For instance, the court held that as written the Rule does not compel the conclusion that inculpatory evidence is immune from disclosure, reasoning that "just as important to the preparation of a defense [is] to know its potential pitfalls as it is to know its strengths." *Marshall*, 132 F.3d at 67. Defense counsel in the instant case requested well before trial, in July 2015, that the government identify "all patients" alleged to be involved with Global Healthcare's Medicaid submissions and "false and fraudulent claims." The trial date was continued on multiple

occasions in order to enable the government to complete discovery so that defense counsel could prepare for trial. Yet three weeks into the trial, just before the government rested its case-in-chief, the government disclosed for the first time a report purporting to show that 567 D.C. Medicaid beneficiaries for whom Global Healthcare had received Medicaid reimbursements did not qualify for or did not receive personal care services. A month before the trial the prosecutor had requested that Don Shearer, the Director of Health Care Operations at the D.C. Department of Health Care Finance ("DHCF"), figure out how to "quantify" the scope of the fraud by Florence and Michael Bikundi at Global Healthcare. Trial Tr. 113 (Nov. 4, 2015 AM). The prosecutor proposed to introduce the report into evidence through Mr. Shearer's testimony at trial. Defense counsel, caught unawares, objected to admission of the report, claiming that allowing the report into evidence at this point would be "unfair" sandbagging and its identification and its production were "untimely" under Rule 16. Trial Tr. 16 (Nov. 3, 2015 PM).

The district court judge acknowledged that the Assistant U.S. Attorney's timing in disclosing Mr. Shearer's report after the trial had been underway for three weeks was "not great." *Id*. The judge also acknowledged that the delay impaired the defense's "ability to scrutinize [the report] in terms of the beneficiaries." *Id.* at 110. Recognizing the difficult situation in which the prosecutor had placed the defense and the trial court, the judge proposed to delay Mr. Shearer's testimony until the next day in order to allow defense counsel the opportunity to interview him. Defense counsel objected that an overnight continuance would hardly "cure[] the problem," because what the defense needed was time to investigate the data and conclusions in the report. *Id.* at 19. Defense counsel reiterated that Florence and Michael were "being ambushed." *Id.* The

judge ruled the report could be admitted into evidence and delayed Mr. Shearer's testimony until the next day, observing that "any testimony from Mr. Shearer is ripe fodder for cross-examination about the legitimacy of whatever conclusions can be drawn from this exhibit." *Id.* at 112.

Florence and Michael contend that, in response to their pretrial discovery request, the government was obligated under Rule 16 to disclose Mr. Shearer's report and its underlying data, and that "admission of the report on less than one day's notice to [them] violated their substantial rights" to mount a defense. Appellants' Br. 57. They pointed out that the government had had control over the data, which was central to the prosecution, and that the government had had access to the data in preparing its case for trial. If the data had been timely disclosed to the defense, Florence and Michael maintain that they could have investigated the listed Global Healthcare clients to determine whether they stopped making D.C. Medicaid claims for legitimate reasons and thereby "undermine[d] the inference [of fraud] the government asked the jury to draw." *Id.*

In response, the government properly does not maintain that the report falls within the scope of the bar in Rule 16(a)(2) of discovery of internal government documents, for the defense is to be allowed to examine documents material to preparation of its defense. *See United States v. Armstrong*, 517 U.S. 456, 463 (1996). The prosecutor's pretrial efforts to obtain what he knew would be "compelling evidence" of appellants' fraud fits comfortably within the mandatory disclosure obligations of Rule 16(a)(1)(E). Trial Tr. 154 (Nov. 9, 2015 AM). Instead, the government maintains it had no disclosure obligation under Rule 16 until it received the report. When it did, it disclosed the report to the defense and the district court during trial. This

is so, the government maintains, notwithstanding defense counsel's spot-on discovery request and the prosecutor's knowledge that Mr. Shearer was preparing an important report in response to *his* pretrial request to show the full scope of appellants' fraud, and that the report was not in hand when the trial began.

In maintaining it did not violate Rule 16, the government asserts that the data used to prepare the report was not within its control, relying on *Marshall*, 132 F.3d at 68. In *Marshall*, the prosecutor had learned during trial of a prior arrest record for the defendant from the Prince George's County, Maryland Police Department. *See id.* at 66. The district court judge criticized the late disclosure of the county police records, attributing it to the "sloppy police work and insufficient investigation" by the U.S. Attorney's Office. *Id.* at 67. But finding the decision to conduct additional investigation mid-trial was not a product of bad faith, the judge allowed testimony about the police records at trial. On appeal, this court affirmed, reasoning that the local Maryland county law enforcement agencies were not under the control of the U.S. Attorney's Office for purposes of Rule 16 discovery. *Id.* at 68.

The government, at best, overreads *Marshall*. This court may have held Rule 16 did not encompass documents that were in possession of a state law enforcement agency*, see id.*, but the court did not suggest in *Marshall* that the local police department had been centrally involved in the federal investigation and prosecution, much less been asked to prepare a report for introduction at the trial. Here, by contrast, the D.C. Medicaid data and records of Global Healthcare were at the heart of the federal government's prosecution of Florence and Michael. DHCF investigates Medicaid fraud and refers investigations to the U.S. Attorney's Offices for prosecution.

In the prosecution of Florence and Michael, Mr. Shearer was also a key witness at trial. Significantly as well, unlike in *Marshall*, 132 F.3d at 66, the new evidence in the form of his report was not discovered during trial. On cross examination, Mr. Shearer disclosed that prior to trial the prosecutor had requested he prepare a report to "quantify the amount . . . of actual fraud." Trial Tr. 113 (Nov. 4, 2015 AM). Upon producing the report at trial, the prosecutor acknowledged that it was an important part of the government's case-in-chief, telling the judge that the report was "highly relevant" and necessary "to establish the full extent of the fraud." Trial Tr. 15 (Nov. 3, 2015 PM). In closing argument, the prosecutor told the jury that the report provided "very compelling evidence that Medicaid had to pay almost $29,500,000 for 567 people [who] . . . did not qualify for or need personal care services." Trial Tr. 154 (Nov. 9, 2015 AM).

Today, the court is able to assume without deciding that the government violated Rule 16's mandates because of the fortuitous circumstance that cross examination of Mr. Shearer diminished much of the sting of his report. Not completely, however, for the report laid out the scope of appellants' fraud in an organized form that the jury would readily comprehend. But insofar as the report did not address whether there were legitimate reasons the listed beneficiaries stopped receiving services, the district court could reasonably conclude "any testimony from Mr. Shearer is ripe fodder for cross-examination" about the conclusions to be drawn from this report. Trial Tr. 112 (Nov. 3, 2015 PM).

Of course, the fortuity of effective cross-examination to ameliorate if not neutralize the prejudice arising from the Rule 16 violations does not mean the prosecutor's pretrial request and knowledge a report was being prepared were not material

to preparation of the defense. The district court judge's response at trial upon learning of the report makes this clear. Any defense counsel would want to know the report was being prepared before having it "sprung" at trial when, as any prosecutor would be aware, a district court judge would be unlikely to allow a lengthy delay of trial to afford the defense time to investigate the data and conclusions in the report. By proceeding as it did, the government defeated the aim of Rule 16 to avoid "gamesmanship." In forceful terms, this court instructed in *Marshall*, that "a prosecutor may not sandbag a defendant by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case." 132 F.3d at 69 (quotation omitted). Regrettably, the court's instruction was prescient of what occurred in the prosecution of Florence and Michael. The U.S. Attorney's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done," *see Berger v. United States*, 295 U.S. 78, 88 (1935), and in prosecuting with "vigor," *id.*, to do so in accordance with the rules of criminal procedure, *see id.* In other circumstances, such conduct as occurred here would raise concerns identified by the Supreme Court and this court in view of the underlying purposes of Rule 16 that would oblige a district court judge to ensure an appropriate sanction for a violation of Rule 16.